(76 South. 228)

No. 21956.

COLEMAN v. SEWERAGE & WATER BOARD.

(June 11, 1917. Rehearing Denied June 30, 1917.)

*(Syllabus by the Court.)*

CONTRACTS ⬥⟝350(1)—EMPLOYMENT AS EFFICIENCY EXPERT—CHARGE—EVIDENCE.

Where, without any previous agreement as to compensation, a civil engineer is employed as an efficiency expert to investigate the operations extending over a period of years of a concern which, during such period, has expended $13,000,000 in work done by employed labor, and by contract, with a view of ascertaining which of the methods is the better, and whether the work has been overmanned or overpaid, and of making suggestions for greater efficiency and economy, a charge which is not greater than was customary with the person employed, is supported by the testimony of other engineers, and, as against the reasonableness of which no evidence is offered, will be sustained.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by John F. Coleman against the Sewerage & Water Board. Judgment for plaintiff, and defendant appeals. Affirmed.

Walter L. Gleason, of New Orleans, for appellant. McCloskey & Benedict, of New Orleans, for appellee.

Statement of the Case.

MONROE, C. J. Defendant has appealed from a judgment condemning it to pay plaintiff $5,000 for professional services rendered in his capacity as civil engineer.

It appears that in December, 1913, the mayor, as such, and as ex officio president of the defendant board, called the attention of the board to certain criticism to which it was being subjected and recommended that the finance committee be authorized to investigate "all the departments from beginning to end," and to employ such "efficiency experts" as might be deemed necessary to aid them in reaching correct conclusions concerning the matters at which the criticism was leveled, namely:

"First, as to the cost of construction work done through the forces of the board as compared with the cost submitted by independent contractors.

"Second, as to the number of persons employed by the board, and the necessity therefor.

"Third, as to the adequacy or inadequacy or excessiveness of the salaries of the various employés."

The committee was accordingly so authorized, and, without themselves attempting an investigation, which they felt would be ineffectual to disarm the criticism, and, for the same reason, without calling upon the distinguished engineers who had, for years, constituted their "advisory board," and, by whose advice, to a great extent, the system to be investigated had been established and maintained, they determined to employ, as efficiency experts, gentlemen whose experience, positions, and reputations warranted the belief that an investigation made by them would be received by the people of this community as competent, disinterested, and thorough. They accordingly sought and obtained the services of Professor Gregory, a distinguished member of the faculty of the College

of Technology of Tulane University of Louisiana, of General Perrilliat, for many years a member of the Louisiana state board of engineers, and of the plaintiff, to whose various positions and experiences we shall again refer. It is true that the chairman of the committee who acted in the matter (than whom no one stands higher in the public estimation) says, in the testimony given by him, that so far as he was personally concerned plaintiff would not have been his choice, but he also testifies as follows, in that same connection, to wit:

"After Mayor Behrman suggested that this investigation be made, of course the question was as to who should be selected to make the investigation. The only real experts in New Orleans on these matters of water, drainage, and sewerage are our own engineers. It is not claimed by Messrs. Coleman, Gregory, and Perrilliat that they know very much about these special subjects, but an investigation by our own engineers would have been an investigation by ourselves, which, probably, would have been received with more or less distrust by the public, so we had to look for other names. * * *

"Q. But, irrespective of your personal choice in the matter, was not Mr. Coleman selected and appointed on account of his knowledge and experience as a competent engineer? A. That is true. I consider Mr. Coleman a man of ability and reputation in his profession, but without any special knowledge, as I stated, or competency, in matters of sewerage, drainage, and water."

Save for the allegation in plaintiff's petition that the services required of his associates and himself were of a high order and called for unusual professional ability and extended experience, both practical and theoretical, we find in the record neither claim nor disclaimer on his part with respect to his ability to do the work for which he was employed, nor do we find any other oral testimony upon that subject than as above quoted. The written (or printed) report of the result of that work impresses us as showing ability and knowledge of the subject with which it deals, and the qualifications of the writer (whom we take to have been the plaintiff) may to some extent be judged thereby and by the following summary of the positions held and the opportunities enjoyed by him for acquiring such qualifications, to wit: He was about 47 years of age when employed by defendant, and was a member of the American Society of Civil Engineers, of the Louisiana Engineering Association, and of the American Railway Engineering Association. He had been for about 30 years in the active practice of different branches of his profession, including work and experience in the location, construction, and maintenance of railroads mentioned by him, the building of a smelter in California, and of port facilities at port Chalmette, in this state, the taking of discharge observations for the government on the Mississippi, Ohio, and Achafalaya rivers, and the improvement of the Sabine, and general work as a contracting engineer, and for about 5 years in the capacity of principal assistant engineer of the city of New Orleans. His employment by defendant began on December 13, 1913, and he handed in the report, agreed upon by him and his associates, on May 6, 1914. By way of introduction, the report contains a recital of the subjects to be investigated as suggested in the letter of the mayor and then the following statement, which has not been questioned in this case, to wit:

"It was further requested that this investigation should * * * date from January 1, 1908, and extend to the date upon which the report should be submitted. It was further understood that, should this examination result in the conclusion that the execution of the functions of the board, under the present organization, is, in any details, lacking or unsatisfactory, the report to be submitted by the committee should include recommendations for such measures as should seem necessary for the improvement of the organization. In brief, your investigating committee was requested to make what is now termed an "efficiency" examination of your organization, and to report its conclusions and suggestions with respect thereto."

And then follows a most elaborate and detailed report, showing the operation and expenditures of defendants' system, as a whole, and of its various departments, of which there are many, during the preceding 6 years,

with suggestions concerning greater efficiency and economy. In the recapitulation, it appears that the total expenditures of the board between January 1, 1908, and December 31, 1913, were "$13,690,695, and it is shown by the testimony that, in December, 1913, there were 1,100 persons on the pay rolls, whose aggregate compensation amounted to nearly $1,000,000 per annum. Being asked upon what basis he made his charge of $5,000, plaintiff replied:

"Based on the character of the services, and the amount of service, the responsibility involved in the service where there is an expenditure of $13,500,000, over a period of some 6 years. We investigated special questions that were referred to us; for example, force account versus contract account. We investigated the organization, composed of some 1,100 men, with salaries and wages amounting to nearly $1,000,000 a year, and we also investigated special complaints and criticisms."

He also testified that he makes his charges in various ways, according to varying circumstances; that some of his clients are charged annual retaining fees, plus a per diem, and expenses when he is actually employed, others a lump sum, and still others merely a per diem and expenses; and that, since 1903, he has never charged less than $50 a day and expenses, and has frequently charged, and been paid, $100 a day, and expenses, and fees which, upon a per diem basis, would amount to much more; and he gives the names of quite a number of his clients from whom he has received such payments. He further testifies that he kept a minute record of the time devoted to the investigation in question, and that it amounted to 110 days, of seven hours each, though not consecutive days or hours. His testimony as to the value of his services is corroborated by that of five civil engineers, of standing and repute, who agreed that the fee charged is not only reasonable, but low, and that the time consumed was also reasonable. The report handed in by plaintiff was equally surprising and unsatisfactory to defendant, in

that it found room for criticism of the system which had been the subject of investigation and defendant, at once provoked another investigation by Messrs. Herring, Fuller, and Eddy, of whom, as we understand the testimony, Messrs. Herring and Fuller had designed, or participated in designing, the drainage system, long prior to 1908, and thereafter had been retained as an "advisory board," at annual salaries of $1,200 per annum each, with special compensation at the rate of $100 per day and expenses when called on for service. Mr. Earl, defendant's chief engineer, testifies that he was the responsible, designing, head and executive of the system at a later date, after the drainage system was merged with the sewerage and water system, but that he had the benefit of the advisory board's advice which had been a great help to him in many directions, and particularly in connection with the water purification work. Messrs. Herring and Fuller, it appears, received the retaining fees mentioned until 1909. Mr. Eddy was never employed by defendant until called on in 1914, with Messrs. Herring and Fuller. The three gentlemen were furnished, in advance, in New York, with the report handed in by plaintiff and his associates; they arrived in Louisiana on June 11th, and made their own report on June 20, 1914, and they were paid each $1,750 for the service so rendered, upon the basis of $100 a day and expenses from the time of their leaving home until they returned. What their instructions were, what line of investigation they pursued, what they reported, and whether they made any suggestions, are matters that appear to be left to inference. Defendant offered no evidence as to the value of plaintiff's services.

### Opinion.

The main argument of the learned counsel for defendant seems to be that, if Messrs. Herring, Fuller, and Eddy, drainage, sewer-

age, and water experts, of national repute, were satisfied with $1,750 each for making an investigation, plaintiff should not be paid a larger amount, but we have no definite information as to what Messrs. Herring and associates were requested to do, or did, as their report is not in the record, and the most that we gather from the testimony is that they were requested to make an investigation of defendant's operations, and that they did so, and made a report, but whether the request to them was the same as that made to plaintiff and his associates, and whether the report covered the same subject-matter, does not appear. It is also said that General Perrilliat is willing to receive $3,500 as his fee, but there is nothing in the record upon that subject, neither he nor Professor Gregory having appeared in the case. For whatever they may have done, Messrs. Herring et al. were allowed, as we have stated, $100 a day and expenses; plaintiff is asking for less than $50 a day, including expenses; and, though the one party consumed nine days, of probably more hours, in actual work, and the other, 110 days, of less hours, there is nothing in the record from which we can conclude that either party consumed more time, in the work done by each, than was necessary, or that the one was paid, or that the other (so far as plaintiff is concerned) is demanding more than a fair compensation.

The report of plaintiff and associates is filled with figures, derived at first hand, about which there is no dispute, and we can hardly imagine that Messrs. Herring and associates wasted their time in obtaining from books and other original documents or papers information which had already been thus furnished to them. More than that, two of them were familiar with defendant's methods of operation, and had been so for years. In fact, they may be said to have fathered them, from which it is to be supposed that the suggestions offered by plaintiff and associates had, long before, been considered by them, and disapproved, and, if we are correct in that supposition, it was much simpler for them to take the case in that condition and give reasons for their opinion, whatever it may have been, than for plaintiff and associates to gather, from many different sources, a quantity of original data, digest it, and reach their conclusions upon points arising out of particular operations which they had not before been called upon to investigate. It appears to us that there was but little in the work that they were called on to do that required a specialist in drainage, sewerage, or water problems, and a great deal that required the knowledge and experience of a contracting engineer, or of engineers familiar with excavation, construction, and the handling of men. Plaintiff and associates were not called on to investigate the merits of the schemes of drainage, sewerage, water supply and filtration which had been adopted by defendant; their function was to examine into and report upon the methods which were employed in the execution of those schemes; to find out and report whether it was better to do the excavating, sewer building, pipe laying, etc., which they required, by an employed force, or by contract; whether there were not more men employed than were needed; whether the salaries and wages were not too high; and to suggest such improvements in the existing methods as might occur to them after mastering the facts; and, in order to obtain that information and make those suggestions, they were requested to look into defendant's operations for the six preceding years, during which over $13,000,000 had been expended upon a vast amount of work, done partly under the direction of defendant, and partly by contractors. General Perrilliat, it may be remarked, does not appear to have devoted as much of his time to the investigation as did Messrs. Coleman and Gregory, and was obliged to go abroad before it was completed, which is, perhaps, his reason for being will-

ing to accept a smaller fee than may be awarded to plaintiff. He is not before the court, however, and there is no reason why his interest should be discussed. We find no error in the judgment appealed from, which is therefore

Affirmed.